IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAMELA TILLMAN,               )
                              )
        Plaintiff,            )
                              )
    v.                        )        No. 08 C 1641
                              )
U.S. ENERGY SAVINGS CORP.,    )        Judge Blanche M. Manning
                              )
        Defendant.            )        Magistrate Judge Jeffrey Cole

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
### MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Defendant, Indiana Energy Savings Corp. (d/b/a U.S. Energy Savings Corp.) (named

herein as U.S. Energy Savings Corp.), by its undersigned attorneys, submits the following

Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's Amended

Complaint:

### BACKGROUND

Plaintiff is a resident and citizen of Indiana. (Am. Compl. ¶ 18). On August 17, 2007,

she entered into a five-year contract with Indiana Energy Savings Corp. (d/b/a U.S. Energy

Savings Corp.) ("U.S. Energy") to supply natural gas for her residence at a fixed price per therm.

(Am. Compl. ¶ 3 and Exh. A). Public utilities such as Peoples Gas (Ill.) or Northern Indiana

Public Service Co. ("NIPSCO") (Ind.) typically supply natural gas to consumers at rates per

therm that vary from month to month. (Am. Compl. ¶ 2-3). Plaintiff alleges that after entering

into her contract with U.S. Energy, her gas bills were higher than they would have been if she

had remained with NIPSCO. (Am. Compl. ¶ 16). She alleges that she was misled to believe that

she would save money through the fixed price contract. (Am. Compl. ¶ 16). Plaintiff's

Amended Complaint raises two causes of action: 1) consumer fraud under Indiana and Illinois statutes; and 2) unjust enrichment. Plaintiff seeks to bring this action on behalf of herself and also a class of all consumers in Indiana and Illinois who entered into fixed price contracts with U.S. Energy and were billed amounts greater than what they would have paid if they had remained with their original gas supplier.

Plaintiff's Amended Complaint should be dismissed for failure to state a cause action under Rule 12(b)(6) and Rule 9(b). Plaintiff's consumer fraud claim should be dismissed because she has failed to plead the allegations of fraud with sufficient particularity as required by Rule 9(b). Plaintiff's claim for unjust enrichment fails under both Indiana and Illinois law because there is a written contract that governs the transactions at issue, which precludes an unjust enrichment claim. In addition, Plaintiff fails to state a cause of action on behalf of a class of Illinois consumers because she is not a member of any such class and has no standing to seek relief under Illinois law. Her contract contains a binding choice of law provision designating Indiana law as governing all disputes and she has no standing under the Illinois Consumer Fraud Act. Finally, even assuming Plaintiff could proceed with a putative class action on behalf of Illinois consumers, this court should dismiss, or alternatively stay, such action under the *Colorado River* doctrine, because the Attorney General of Illinois is already prosecuting an identical claim in state court seeking the same relief on behalf of the same group of consumers.

## ARGUMENT

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir. 1997). Although, when ruling on the motion to dismiss, the court accepts as true all well-pleaded facts alleged in the complaint, the court is "not

obliged to accept as true conclusory statements of law or unsupported conclusions of fact."

*McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 614 (7th Cir. 2001).

**I.    Plaintiff Fails To State A Cause Of Action For Consumer Fraud Under Rule 9(b).**

Count I of Plaintiff's Complaint attempts to state a cause of action for consumer fraud

under both the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/1, *et seq.* and the Indiana

Deceptive Consumer Sales Act ("IDCSA"), Ind. Code § 24-5-0.5-1, *et seq.* Under both of these

causes of action, Plaintiff must plead allegations with the specificity required of fraud claims

under Rule 9(b). Under the Illinois statute, all consumer fraud claims require the plaintiff to

plead with specificity. *Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.*, 940 F. Supp. 176,

180 (N.D. Ill. 1996).

The Indiana statute applies to two different types of alleged deceptive acts: 1) ordinary

"deceptive acts," which require a plaintiff to give notice and an opportunity to cure before

bringing an action; and 2) "incurable deceptive acts," which require a "scheme, artifice, or

device with intent to defraud or mislead." Ind. Code 24-5-0.5-2(6)-(7). Allegations under the

IDCSA based on incurable deceptive acts require the Plaintiff to plead fraud with specificity.

*SMC Corp. v. Peoplesoft USA, Inc.*, 2004 WL 2538641, *4-5 (S.D. Ind., Oct. 12, 2004).

Because Plaintiff here does not specify which type of acts she alleges, the presumption under

Indiana law is that she is proceeding with a claim for incurable deceptive acts, and must plead

with specificity. *Id.* (citing *McKinney v. State*, 693 N.E.2d 65, 73 (Ind. 1998)). Nothing in the

Amended Complaint serves to rebut this presumption. First, she would have no cause of action

for curable deceptive acts because she does not allege that she provided notice and an

opportunity to cure. Ind. Code. 24-5-0.5-3. Second, she specifically alleges that her action is

based on fraudulent, deceptive, willful and knowing acts. (Am. Compl. ¶¶ 3-17 and 36). As a

result, it is clear that the gravamen of her complaint sounds in fraud and therefore she must plead with specificity. *SMC Corp.*, 2004 WL 2538641 at *4-5.

The standards under Rule 9(b) require that Plaintiff plead specifically "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Gallagher Corp.*, 940 F. Supp. at 180. In this case, Plaintiff falls far short of that standard. Plaintiff's allegations relating to the alleged fraudulent activity are contained in Paragraphs 3-13 and 24 of her Amended Complaint. Nearly every required element is missing from those Paragraphs. Nowhere does Plaintiff ever allege who from or on behalf of U.S. Energy made any representation of any kind. In Paragraphs 4-13 she fails to identify any required information, such as who made the representations, where, when, to whom, how, or what specifically was said. She merely states vaguely that "customers have been told" this or that, without saying which customers, who told them anything, where this took place or when.[1] As a result, these paragraphs fail to meet the requirements of Rule 9(b).

In Paragraph 3, Plaintiff alleges that U.S. Energy "uniformly" tells consumers in writing that its program "has saved consumers over the years substantial sums of money." She never alleges who made this statement, when it was made, or that it was ever made to any particular consumer, let alone herself. As a result, "[Defendant] and the Court are left to speculate what specific advertisements and statements underlie" this claim, rendering the allegations deficient. *CardioNet, Inc. v. LifeWatch Corp.*, 2008 WL 567031, *3 (N.D. Ill. Feb. 27, 2008). She claims the statement is made "uniformly" but fails even to allege that it was ever made to her at a minimum.

---

[1] At one point Plaintiff reveals that her allegations are not based on any personal knowledge but upon parroting a news story (Am. Compl. ¶ 13) and then refers to an exhibit supposedly about that news story, but no such exhibit was attached to the pleading.

Certainly this statement is not present in the two documents Plaintiff refers to and attaches to her Amended Complaint—Exhibits C and D.  In fact, Plaintiff's allegations about those Exhibits are contradicted by the Exhibits themselves.  She alleges that Exhibit C is a solicitation she received containing a graph that depicts the fixed U.S. Energy gas rate "as if it were less than the utilities' rate over a period of time." (Am. Compl. ¶ 3 and 24).  Contrary to this allegation, the graph in Exhibit C shows that the U.S. Energy rate is sometimes lower and sometimes higher than the utilities' rate.  (Am. Compl. Exh. C, pp1 and 3).  When an exhibit to a complaint contradicts an allegation in that complaint, the exhibit "trumps" the allegation.  *BCWC LLC v. Reading Rock, Inc.*, 2007 WL 2955573, *1 (N.D. Ill., Oct. 10, 2007); *Rowan v. Max Auto Mall, Inc.*, 2002 WL 215524, *3 (N.D. Ill., Feb. 12, 2002) (dismissing consumer fraud claim based on false representation when the alleged representation is contradicted by exhibit to complaint).  As a result, Plaintiff's claim based on this allegation fails, even if she had alleged the necessary detail under Rule 9(b).  Plaintiff is essentially alleging, at most, that the graph in Exhibit C implies or suggests that the fixed price is lower or will result in savings.  But an allegation that some representation "has the effect of implying" something allegedly false is not sufficient under Rule 9(b).  *LifeWatch Corp.*, 2007 WL 567031 at *3.  In addition, not only does that Exhibit not say that customers "will save money," as Plaintiff alleges, it actually explains that there is only a "potential for savings if utility rates go above the fixed price." (Am. Compl., Exh. C, p. 3) (emphasis in original).  Again, the Exhibit contradicts and trumps the allegations in the Amended Complaint.  Plaintiff's allegations fail to meet the pleading standards and her claim for consumer fraud must be dismissed.

Plaintiff also refers to Exhibit D, which is an alleged website page.  She makes no allegations that this contains any representations that were made to her or that she saw at any

time prior to contracting with Defendant.  (Am. Compl. ¶ 3).  Moreover, it is clear from Exhibit D itself this it refers to a Canadian entity, a Canadian website, and consumers and utilities in Canada.  It defies reason that Plaintiff could have received or had been misled by representations from another country.  Even if she had seen it, that Exhibit also contradicts the allegations in the Amended Complaint and expressly states that there is only a "potential for savings if utility rates go above the fixed price." (Am. Compl., Exh. D, p. 1) (emphasis in original).  Plaintiff has failed to allege fraud with the required specificity under Rule 9(b).  In those few instances in which she does try to allege specific information by referring to Exhibits (though she still fails to allege the who, to whom, where and when), the Exhibits expressly contradict and therefore trump her allegations, defeating her consumer fraud claim even if she had alleged the additional particulars with specificity.

**II.    Plaintiff Cannot State a Claim for Unjust Enrichment Because a Written Contract Governs the Relationship Between the Parties.**

In Count II, Plaintiff seeks to allege a claim for unjust enrichment by alleging that U.S. Energy retains a benefit to which it is not entitled or which is inequitable.  Plaintiff concedes, in fact she expressly asserts, that she entered into a written contract with U.S. Energy on August 17, 2007, and attaches and incorporates that contract into the allegations of each count of the Amended Complaint.  (Am. Compl. ¶ 3, 32, Exh. A).  Both Illinois and Indiana law preclude causes of action for unjust enrichment, a quasi-contractual claim, when there is a contract governing the relationship of the parties.  Illinois law provides that "[b]ecause unjust enrichment is based on an implied contract, 'where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.'" *People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill.2d 473, 496-497, 607 N.E.2d 165, 177 (Ill. 1992).  This is true even when the complaint alleges fraud or misrepresentation.  *Id.*  Similarly, in Indiana, unjust

enrichment is a quasi-contractual claim and, therefore, it "does not operate when there is a governing contract, either express (evidenced by spoken or written words) or implied (evidenced by the conduct of the parties)." *Schafer v. Jeld Wen Doors/IWP Custom Door Div.*, 2007 WL 3407659, *6 (N.D. Ind., Nov. 9, 2007) (also barring a claim for unjust enrichment based on existence of a contract even though the plaintiff alleged fraudulent misrepresentations).

Here, the contract at issue governs every element of the transaction between Plaintiff and U.S. Energy. It addresses the Price she is to pay, the Term, agreements by Plaintiff that she did not rely on any representations or marketing material not included in the contract (Exh. A, Sec. 9), and disclaimers that "<u>Customer understands that the Utility's gas price over the Term may or may not be greater than the Price</u>" she pays (Exh. A, Sec. 4) (emphasis in original). Every element of Plaintiff's claim is in one way or another related to or affected by provisions of her contract. As a result, her claim for the quasi-contractual unjust enrichment fails and Count II should be dismissed.

**III.    Plaintiff's Class Claims on Behalf of Illinois Consumers Must Be Dismissed Because She is Not and Cannot Be a Member of Any Such Class.**

Plaintiff seeks to bring this case as a putative class action on behalf of a class of Illinois and Indiana consumers, raising claims under both Illinois and Indiana law. For example, she attempts to raise claims under both the Illinois Consumer Fraud Act and the Indiana Deceptive Consumer Sales Act. Under no set of circumstances will Plaintiff be able to maintain a combined Indiana/Illinois class with claims under both of these statutes. Under Federal Rule of Civil Procedure 23, Plaintiff may only proceed with a class action if her claim is typical of the claims of all class members. Fed. R. Civ. P. 23(a)(3). This requires that same event or course of conduct that gives rise to the claims of other class members and that her claims "must be based

on the same legal theory." *In re Sears, Roebuck & Co. Tools Mktg. and Sales Prac. Lit.*, 2007 WL 4287511, *6 (N.D. Ill., Dec. 4, 2007) ("Sears II").

Here, the claims of the class will not be based on the same legal theories. Plaintiff expressly attempts to raise claims under two differing state statutes. She has no standing to bring or maintain a claim based on the ICFA. First, her contract provides that disputes are to be governed by Indiana law. (Am. Compl. Exh. A, p. 2A). Second, even if she circumvented that provision, Illinois and federal courts have held that a non-Illinois resident may not maintain a claim under the ICFA unless "the disputed transaction occur primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto Ins. Co.*, 216 Ill.2d 100, 186-87, 835 N.E.2d 801, 853-54 (Ill. 2005); *In re Sears, Roebuck & Co. Tools Mktg. and Sales Prac. Lit.*, 2005 WL 3077606, *1-2 (N.D. Ill., Nov. 14, 2005) ("Sears I"). Although there is no bright line test, the factors a court should consider are as follows:

> i) plaintiff's residence, (ii) where the deception occurred, *i.e.,* where the actual misrepresentation was made, (iii) where the damage to plaintiff occurred, and (iv) whether plaintiff communicated with defendant or its agents in Illinois.

*Avery*, 835 N.E.2d at 854; *Sears I*, 2005 WL 3077606 at *2. In this case, the Plaintiff resides in Indiana, the alleged deception occurred in Indiana, and the alleged misrepresentations must have occurred in Indiana as Plaintiff alleges the transaction was door-to-door. Moreover, any alleged damage could only have occurred in Indiana and there is no allegation that Plaintiff communicated with Defendant in Illinois. Therefore, Plaintiff will not have standing to assert a claim under the ICFA.

If there is to be any remedy under the ICFA for residents of Illinois, that would necessarily have to be a separate class, and Plaintiff, without standing under that claim, cannot be a member of that class. As a result, she lacks the ability to maintain a class claim on behalf of

that other class. *See Cohen v. Ameritech Corp.*, 2003 WL 23312801, *7 (N.D. Ill., Dec. 23,

2003) ("An individual bringing an action on behalf of a class must be a member of the class.").

In *Cohen*, the court held that the named plaintiff lacked standing to assert a claim under the

Americans With Disabilities Act, and therefore she could not be a member of that class and

could not maintain a class action on behalf of class members seeking relief under that statute.

The court therefore struck the class allegations. The same result must follow here, without a

proper class representative for a class of Illinois consumers, the class action for that group cannot

proceed. *Kifer v. Ellsworth*, 346 F.3d 1155, 1156 (7th Cir. 2003) ("[A] class action suit cannot

proceed in the absence of a class representative"). For these reasons, the Court should dismiss

the class allegations for the proposed class of Illinois consumers.

**IV.    All Claims on behalf of Illinois Consumers Should Be Dismissed or Stayed Based on
the *Colorado River* Doctrine, Because the Illinois Attorney General is Proceeding
with State Litigation on Nearly Identical Claims Seeking Identical Relief.**

In *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800 (1976), the

Supreme Court established an abstention doctrine allowing federal courts to dismiss or stay a

case based on pending state court litigation governing the same claims. Prior to Plaintiff filing

the present suit, the Illinois Attorney General initiated a suit in the Circuit Court of Cook County

against Illinois Energy Savings Corp., (d/b/a/ U.S. Energy Savings Corp.) on behalf of all Illinois

consumers who entered into contracts with U.S. Energy, alleging violations of the Illinois

Consumer Fraud Act. *People v. Illinois Energy Sav. Corp.*, No. 08 CH 4913, Circuit Court of

Cook County ("Illinois Lawsuit"). (A copy of the complaint in the Illinois Lawsuit is attached

hereto as Exhibit 1). Because the Attorney General alleges the same claims, based on the same

alleged actions, and seeks the same remedies on behalf of the same Illinois consumers, the Court

should dismiss or stay in this action as to the Illinois Class based on the *Colorado River* doctrine.

Under *Colorado River*, a federal court may dismiss or stay federal court proceedings in favor of concurrent state litigation when doing so would promote "wise judicial administration." *Ingalls v. The AES Corp.*, 2008 WL 896196, *2 (7th Cir. Apr. 2, 2008) (citing *Colorado River*, 424 U.S. at 817). The court must conduct a two-step inquiry to determine when abstention is proper. The first inquiry is whether the two suits are "parallel." *Id.* To meet this requirement, the two "suits need not be identical." *Id.* Rather, suits are parallel when "<u>substantially</u> the same parties are contemporaneously litigating <u>substantially</u> the same issues in another forum." *Id.* (emphasis added). The specific parties in the two suits "need not be the *same*." *Norris v. Miller*, 926 F. Supp. 776, 778 (N.D. Ill 1996). "Even where parties are different, courts may find that their interests are so similar that the suits in question involve substantially the same parties." *Id.* at 779.

The plaintiff and defendant in the Illinois Lawsuit are substantially the same parties as the putative Illinois Class and the defendant in this case. The Attorney General is exercising her statutory authority to pursue an action for restitution on behalf of the people of Illinois, specifically Illinois consumers who did business with U.S. Energy. (See Exh. 1, ¶¶ 1,4, 6-7). The Attorney General is seeking to rescind "<u>all contracts</u> entered into between [U.S. Energy] and Illinois consumers" and seeking restitution of monies paid by such consumers. (Exh. 1, p. 15, ¶ C). Therefore it is clear that she is litigating on behalf of the interests of all Illinois consumers who did business with U.S. Energy and any person who may be a class member in the present action already has his or her interests being pursued in the Illinois Lawsuit.

Also, although Plaintiff here was careless in naming the Defendant properly, it is clear that any Illinois class in the present case would be seeking relief from the same entity sued in the Illinois Lawsuit. Plaintiff names the defendant here as U.S. Energy Savings Corp., which is

simply the d/b/a of the entity with whom she entered into her contract, Indiana Energy Savings Corp. Customers in Illinois actually enter into contracts with a separate entity, Illinois Energy Savings Corp., which, like its sister corporation in Indiana, does business under the name U.S. Energy Savings Corp. (See Exh. 1). Therefore even if the Plaintiff here could proceed with a class on behalf of Illinois consumers, that claim would have to be against the Illinois company, which is already a defendant in the Illinois Lawsuit.

The next inquiry in deciding whether the suits are parallel is whether they involve "substantially the same issues." When making this inquiry, "the district court should determine whether the suits 'arise out of the same facts and raise similar factual and legal issues.'" *Ingalls*, 2008 WL 896196 at *2. The two suits here meet that test. In both cases, the allegations center on U.S. Energy's "Fixed Price" program. (Am. Compl. ¶1; Exh. 1, ¶ 8). Both cases involve the following nearly identical allegations of misrepresentations or omissions in connection with that fixed price program:

- Allegations that consumers have had their gas supplier switched from the utility to U.S. Energy without knowledge (Am. Compl. ¶ 4; Exh. 1, ¶ 29 and 92-97);

- Allegations that consumers are told they will save money (Am. Compl. ¶ 5; Exh. 1, ¶ 16, 69, 83 and 101);

- Allegations that consumers are told they will not see an increase for the cost of gas, and there is no disclosure that delivery charges can increase (Am. Compl. ¶ 6; Exh. 1, ¶ 19, 28, 51 and 60);

- Allegations that representatives say they are from the gas company (Am. Compl., ¶ 7; Exh.1, ¶ 36);

- Allegations that representatives say they are part of a government program (Am. Compl. ¶ 8-9; Exh. 1, ¶ 82);

- Allegations that consumers were not told about termination fees (Am. Compl. ¶ 11; Exh. 1, ¶ 18 and 20);

- Allegations that marketing efforts were targeted to non-English speaking consumers (Am. Compl. ¶ 12; Exh. 1, ¶ 21 and 92);

- Allegations that the termination fees are excessive (Am. Compl. ¶ 15; Exh. 1, ¶ 31).

In nearly all respects, the factual allegations are substantially the same in the two proceedings. In addition, both suits raise claims under the ICFA. Although the present case includes a claim for unjust enrichment, that is not a viable cause of action. Furthermore, even if it were, the remedy sought in that claim (restitution of amounts received by Defendant) is the same remedy the Attorney General is already pursuing on behalf of Illinois consumers in the Illinois Lawsuit. The fact that two proceedings are seeking the same remedies adds to the conclusion that they are substantially similar. *Ingalls*, 2008 WL 896196 at *3. Because of the substantial similarities in parties, factual allegations and legal claims, the two proceedings are parallel for purposes of the *Colorado River* analysis.

The second step in the *Colorado River* abstention analysis is consideration of the following ten non-exclusive factors, with no single factor being necessarily determinative. *Ingalls*, 2008 WL 896196 at *4; *Norris*, 926 F. Supp. at 779.

1) Whether the state has assumed jurisdiction over property - In this instance, this factor is not applicable because there is no property over which to exercise jurisdiction.

2) The inconvenience of the federal forum – Here, in order to proceed as a class of Illinois consumers in the federal forum, Plaintiff will have to meet the onerous requirements of Rule 23 and certify a class. Given the astonishing number of individual inquiries that the claims will necessarily involve, such as specific representations made to thousands of individual consumers and individual issues of proximate cause, such certification presents a significant if not insurmountable hurdle, making the federal forum decidedly less favorable for the consumers. This forum also would require the consumer class representatives to expend substantial money for costs of litigation. The Attorney General, with the full law enforcement powers under the Illinois statutes, and an ample budget, does not face any such hurdles.

3) The desirability of avoiding piecemeal litigation – This is a factor of judicial economy as well as fairness. Having two parallel suits proceed with discovery and trial of the same factual issues, could easily result in inconsistent findings, which in itself is a strong reason to abstain. *Ingalls*, 2008 WL 896196 at *2.

4) The order in which jurisdiction was obtained by the concurrent forums – Again, this factor favors dismissal because the Attorney General's action was filed first. *Norris*, 926 F. Supp. at 779.

5) The source of governing law – This case purports to be a diversity action seeking to apply Illinois law. The application of state law favors giving deference to the expertise of the state courts. *Id.*, and *Ingalls*, 2008 WL 896196 at *4.

6) The adequacy of the state-court action to protect the federal plaintiff's rights – The Illinois lawsuit is a more effective proceeding to protect the rights of Illinois consumers because the Attorney General is not required to meet the requirements for class certification, but has law enforcement powers to sue on behalf of all affected Illinois consumers. 815 ILCS 505/7.

13

7) The relative progress of the state and federal proceedings – This factor is essentially neutral although the Illinois Lawsuit was filed first.

8) The presence or absence of concurrent jurisdiction – There is concurrent jurisdiction.

9) The availability of removal – removal of the Illinois Lawsuit is not possible, because there is no federal question and no diversity jurisdiction. As a result, these two actions could not be combined or consolidated in federal court.

10) The vexatious or contrived nature of the federal claim – In the present case, the allegations are essentially parroted from the Illinois Lawsuit (though with much less specificity), and there is not even a class representative that could maintain an action on behalf of an Illinois class. Though this may not rise to the level of vexatious, it demonstrates that the federal action is unnecessary or superfluous.

For all of these reasons, this Court should dismiss the action on behalf of the proposed Illinois class. Although the Court has an option to simply enter a stay, there is no particular need to do that in this case. The general rule that a stay is preferable to dismissal is based on the concern that the state court proceeding may wash out or terminate without fully adjudicating the rights of the parties. The typical concern at issue is that "a dismissal, even without prejudice, creates a risk that the federal plaintiff could be time-barred from bringing the federal suit again if the state action does not proceed to a final decision on the merits." *Triumvera Homeowners' Ass'n. v. Continental Cablevision of Cook County*, Inc., 1994 WL 23067, *8 (N.D. Ill., Jan. 21, 1994). In this instance, however, the ICFA provides that when the Attorney General brings an action on behalf of consumers, the statute of limitations on every private right of action "based in whole or in part" on any matter raised in that action is tolled throughout the proceedings and for one year thereafter. 815 ILCS 505/10a(e). Therefore, even if the Attorney General action

"washes out" or otherwise fails to address the claims these consumers may have, the consumers right to bring an action after that is preserved by this tolling provision. Therefore, there is no risk to the potential class of losing their rights as time-barred by entering a dismissal as opposed to a stay.

WHEREFORE, Defendant respectfully requests that this Court enter an order:

1) Dismissing Plaintiff's Amended Complaint with prejudice under Rules 12(b)(6) and 9(b);

2) Dismissing Plaintiff's claims under Illinois law or on behalf of a putative class of Illinois consumers under Rule 12(b)(6); or alternatively

3) Dismissing or staying Plaintiff's claims with respect to a putative class of Illinois consumers under the *Colorado River* doctrine; and

4) Granting such additional relief as the Court deems just.

Respectfully submitted,
INDIANA ENERGY SAVINGS CORP.


By: /s/ Kevin J. Clancy
    One of Its Attorneys


Martin W. McManaman (ARDC #6237665)
Kevin J. Clancy (ARDC #6217109)
Lowis & Gellen
200 West Adams Street
Suite 1900
Chicago, Illinois 60606
312-364-2500

# EXHIBIT 1

Attorney Code 99000

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - CHANCERY DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | No.  0 8 C H 0 4 9 1 3 |
| ) | |
| ILLINOIS ENERGY SAVINGS CORPORATION, ) | |
| A Delaware Corporation, d/b/a ) | |
| U.S. Energy Savings Corporation, ) | |
| ) | |
| Defendant. ) | |

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN,

Attorney General of the State of Illinois, brings this action complaining of defendant, ILLINOIS

ENERGY SAVINGS CORPORATION, a Delaware corporation, d/b/a U.S. Energy Savings

Corporation (hereinafter referred to as "Defendant"), and states as follows:

### JURISDICTION AND VENUE

1.      This action is brought for and on behalf of THE PEOPLE OF THE STATE OF

ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, pursuant to the

provisions of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, and

her common law authority as Attorney General to represent the People of the State of Illinois.

2.      Venue for this action properly lies in Cook County, Illinois, pursuant to section

2-101 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, in that some of the transactions

complained of herein out of which this action arose occurred in Cook County.

## PARTIES

3.    Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, is charged, *inter alia*, with the enforcement of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1.

4.    Defendant, ILLINOIS ENERGY SAVINGS CORPORATION, is a Delaware corporation, registered to do business in Illinois, and has a place of business in Chicago, Illinois.

## COMMERCE

5.    Subsection 1(f) of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1(f), defines "trade" and "commerce" as follows:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any   services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

6.    Defendant was at all times relevant hereto, engaged in trade and commerce in the State of Illinois to wit: advertising, soliciting, offering for sale and selling of natural gas supply services, and accepting monies from Illinois consumers for the same.

## DEFENDANT'S COURSE OF CONDUCT

7.    From May 2004 to the present, and on a continuing basis, Defendant engaged in trade or commerce by advertising, soliciting, offering for sale, and selling natural gas supply services to Illinois consumers participating in the Northern Illinois Gas Company's ("Nicor") Customer Select program, and Peoples Energy Choices For You[SM] program, which allow consumers in eligible service areas to select an alternative, non-utility gas supplier for their natural gas needs within the State of Illinois.

2

8.     In May 2004, Defendant began offering its Natural Gas Fixed Price Program to residential customers in Illinois through the Nicor Customer Select program and the Peoples Energy Choices For You$^{SM}$ program.

9.     Defendant's Natural Gas Fixed Price Program is a fixed-price storage contract under which customers pay a fixed rate for their natural gas supply for the duration of the contract.

10.     The contract duration offered is four or five years.

11.     Defendant markets its gas supply services to Nicor Customer Select and Peoples Energy Choices For You$^{SM}$ customers through a door-to-door sales campaign.

12.     Compensation for sales agents is 100% commission-based.

13.     During door-to-door solicitations, prospective customers are told that the fixed-rate contract can provide a consistent price in a volatile market.

14.     During door-to-door solicitations, prospective customers are told that because natural gas prices are driven by supply and demand, and rates have been steadily rising over the past few years, consumers can benefit by locking in the offered rate under a five year contract.

15.     During door-to-door solicitations, some prospective customers are told that gas prices will "go through the roof" in the very near future.

16.     During door-to-door solicitations, some prospective customers are told that they will save money when in fact, Defendant cannot substantiate claims of savings. To date, there is no evidence to support the representations that consumers will save money, and there is substantial research from the Citizens Utility Board that shows that consumers have not saved any money from contracting with Defendant.

17.     During door-to-door solicitations, some prospective customers are told that

3

Illinois requires customers to select an alternative natural gas supplier when in fact selecting an alternative supplier is not required.

18.    During door-to-door solicitations, some of Defendant's sales agents do not explain the existence of, or the calculation of, an early termination fee, when in fact customers who terminate contracts early are subject to termination fees.

19.    During door-to-door solicitations, some of Defendant's sales agents do not explain that the supply fee charged by the Defendant is only part of the total monthly bill and that the customer will be responsible for paying the delivery charge to the regulated utility.

20.    During door-to-door solicitations, Defendant's sales agents do not disclose to prospective customers that the contract price per therm is higher than the price that has historically been offered by the regulated natural gas suppliers.

21.    During door-to-door solicitations, some of Defendant's sales agents negotiate the contract entirely in English with consumers who do not speak English.

22.    In some instances during door-to-door solicitations, Defendant's sales agents represent to consumers that they can terminate the contract at anytime without a penalty, when in fact there is a substantial penalty.

23.    If a customer agrees to sign up for Defendant's product, the sales agent completes a contract that identifies the contract price and the terms and conditions of the agreement.

24.    Defendant alleges that sales agents call a third party verifier from the customer's home in order to verify the transaction.

25.    After the contract is signed, Defendant enrolls the customer in the program and allegedly mails the customer a Welcome Letter which further explains the terms and conditions of the agreement of the parties.

4

26.    Customers who agree to enroll in Defendant's Price Protection Program are automatically enrolled on that program's budget billing plan.

27.    A customer's budget billing amount is calculated by multiplying estimated yearly usage by the contract price, and dividing that by twelve to get the monthly payment.

28.    Although customers are told during the door-to-door solicitation that their bills will stay the same from month to month, a customer's budget billing amount can change every four months when Defendant compares estimated usage with actual usage to determine if an adjustment is needed.

29.    Some of Defendant's sales agents enroll customers in Defendant's program without obtaining a valid signature on the contract.

30.    When customers contact Defendant to exercise their statutory 3-day right to cancel the contract that was signed in their home, some of those customers are instructed by automated message to call back at a different time, placed on hold indefinitely, transferred continuously, and/or disconnected without being able to cancel their contracts.

31.    If a customer terminates the contract before the contract expiration date, the termination fee is $0.10 per therm for the number of therms remaining on the contract.

32.    The Defendant continues to market the above referenced program today.

33.    The Plaintiff has received 457 complaints against Defendant as of the date of this Complaint. Plaintiff has also reviewed most of the 2,334 complaints filed with the Citizen's Utility Board. Additionally, the Better Business Bureau processed a total of 254 complaints against Defendant in the last 36 months. More specifically, but not by way of limitation, the following allegations are pled as illustrations of unlawful business practices of Defendant and are not meant to be exhaustive:

5

*Jerry Deasy*

34.    On or about September 6, 2006, one of Defendant's sales agents came to the home of Jerry Deasy located in Chicago, Illinois.

35.    Jerry Deasy is a disabled senior citizen.

36.    The Defendant's agent identified himself as being from "a gas company" and said he had a service that would save the consumer money.

37.    The Defendant's agent told Mr. Deasy that gas rates were going to continue to increase and when they did, Mr. Deasy would wish that he had signed up for their service.

38.    Mr. Deasy explained to Defendant's agent that because he was a disabled senior citizen he wanted to save money and the Defendant's agent told Mr. Deasy that they would take care of him.

39.    The Defendant's agent told Mr. Deasy that gas prices at Peoples Energy were going to "go through the roof" and that the Defendant's program would be a way to avoid paying those high costs.

40.    Mr. Deasy signed a contract for a five year term at $1.19 per therm.

41.    In October 2006, when Mr. Deasy signed up for service with the Defendant, Peoples charged its customers $0.59 per therm.  In October 2005, following Hurricane Katrina, Peoples charged its customers $1.12 per therm.

42.    Mr. Deasy's gas bills with the Defendant's supplier charge were higher than his bills had been with Peoples.

43.    Mr. Deasy contacted Defendant to complain about his high gas bills and to inquire about cancellation.

44.    Mr. Deasy was informed by Defendant that he would have to pay a termination

6

fee if he exited the contract early.

45. Mr. Deasy requested that Defendant cancel his contract without requiring a termination fee and the Defendant refused.

46. After filing a complaint with the Attorney General's office, Mr. Deasy's contract was cancelled without a termination fee.

### Christine Trzos

47. On or about April 1, 2007, a sales agent for Defendant came to the home of Christine Trzos.

48. Christine Trzos lives in Chicago, Illinois.

49. The Defendant's agent told Ms. Trzos that she was required to choose an alternative natural gas supplier.

50. The Defendant's agent told Ms. Trzos that at the promised rate of $1.09 per therm, her bill would total approximately $88 per month on the budget billing plan.

51. The Defendant's agent did not tell Ms. Trzos that she would be required to pay a delivery charge to Peoples in addition to the $88 she would be paying to the Defendant.

52. Ms. Trzos signed a five year contract at $1.09 per therm.

53. In May 2007, when Ms. Trzos signed up for service with the Defendant, Peoples charged its customers $0.90 per therm. Since Ms. Trzos has signed up for service, Peoples has charged the following monthly rates, respectively: in June 2007, $0.82 per therm; in July 2007, $0.82 per therm; in August 2007, $0.70 per therm; and in September 2007, $0.66 per therm.

54. When Ms. Trzos received her first bill, the total owed was more than the $88 she was promised.

55. Ms. Trzos requested that the Defendant cancel her contract without requiring the

termination fee.

56.    Defendant did not allow Ms. Trzos to cancel without paying the termination fee.

57.    After filing a complaint with the Attorney General's office, Ms. Trzos' contract was cancelled without a termination fee.

### Marilyn Hickey

58.    On May 3, 2007, a sales agent for Defendant came to the home of Marilyn Hickey located in Chicago, Illinois.

59.    The Defendant's agent told Ms. Hickey that the price of gas with Peoples was going to increase significantly.

60.    The Defendant's agent told Ms. Hickey that if she signed up, she would lock in a rate for gas that would never go up, no matter what happened.

61.    Ms. Hickey believed she would be paying a lower price for her gas.

62.    Ms. Hickey signed a five year contract at $1.09 per therm.

63.    In June 2007, Peoples charged their customers $0.82 per therm.  Since Ms. Hickey has signed up for service, Peoples has charged the following monthly rates, respectively: in July 2007, $0.82 per therm; in August 2007, $0.70 per therm; and in September 2007, $0.66 per therm.

64.    Ms. Hickey requested that Defendant cancel her contract without requiring a termination fee.

65.    Defendant did not allow Ms. Hickey to cancel without paying the termination fee.

66.    After filing a complaint with the Attorney General's office, Ms. Hickey's contract was cancelled without a termination fee.

8

*Donald Behling*

67.    On February 20, 2006, a sales agent for Defendant came to the home of Donald Behling located in Franklin Park, Illinois.

68.    Donald Behling is a senior citizen.

69.    Defendant's agent told Mr. Behling that he would save money by signing up for Defendant's program.

70.    Defendant's agent did not tell Mr. Behling that the contract term was five years.

71.    Mr. Behling signed a five year contract at $1.30 per therm.

72.    In February 2006, when Mr. Behling signed up for Defendant's service, Nicor charged its customers $0.94 per therm.

73.    For the first six months of 2006, Nicor charged its customers the following prices: in January 2006, $1.09 per therm; in February 2006, $0.94 per therm; in March 2006, $0.67 per therm; in April 2006, $0.66 per therm, in May 2006, $0.61 per therm; and in June 2006, $0.50 per therm.

74.    The highest rate charged by Nicor from at least January 2004 through September 2007 was $1.17 per therm in October and November 2005, immediately following Hurricanes Katrina and Rita.

75.    When Mr. Behling received his bills, he called the Defendant to complain about the lack of savings.

76.    When Mr. Behling spoke to Defendant, Defendant told Mr. Behling to wait and his bill would come down in price.

77.    When Mr. Behling's bill did not decrease, he again contacted the Defendant and was informed of the termination fee.

9

78.    Mr. Behling asked Defendant if he could cancel his contract without paying the termination fee and Defendant refused to allow him to do so.

79.    Mr. Behling filed a complaint with the Attorney General's office to have his contract cancelled without a termination fee and to be refunded the money he had already paid on the contract.

80.    After filing a complaint with this office, Mr. Behling was able to cancel his contract without a termination fee.

### Alicia Nava

81.    On January 30, 2006, a sales agent for Defendant came to the home of Alicia Nava located in Chicago, Illinois.

82.    The Defendant's sales agent told Ms. Nava that the Illinois government had a program for qualified families to help them to save money on gas bills.

83.    The Defendant's sale agent told Ms. Nava that she would save between 40% and 60% on her gas bills.

84.    Ms. Nava signed a five year contract at $1.30 per therm.

85.    In January 2006, Peoples charged their customers $1.13 per therm. Since Ms. Nava has signed up for service, Peoples has charged the following monthly rates, respectively: in February 2006, $1.05 per therm; in March 2006, $0.94 per therm; in April and May 2006, $0.70 per therm; and in June 2006, $0.66 per therm.

86.    The highest rate charged by Peoples from at least January 2002 through September 2007 was $1.19 per therm in November 2005, immediately following Hurricanes Katrina and Rita.

87.    When Ms. Nava received her bill and saw that her monthly charge had increased

10

above what she had paid with Peoples, she contacted Defendant for an explanation.

88.    Ms. Nava filed a complaint with the Attorney General's Office.

89.    Despite efforts by this office, Ms. Nava was not able to cancel her contract without the termination fee.

### Micaela Rivera

90.    Micaela Rivera is a senior citizen living in Chicago, Illinois.

91.    Ms. Rivera filed a complaint with the Attorney General's Office on December 21, 2007.

92.    Ms. Rivera did not sign a contract for Defendant's services.

93.    A contract bearing the name "Micaela Rivera" was executed on June 29, 2006.

94.    Ms. Rivera believes that her name was forged on the contract dated June 29, 2006.

95.    The contract price is $1.19 per therm for a term of five years.

96.    Ms. Rivera learned that Defendant was her natural gas supplier when an employee at a Currency Exchange told her she was paying two different companies on her gas bill.

97.    Ms. Rivera contacted Alderman Ricardo Munoz's office where an employee helped her file a complaint with the Attorney General's office.

98.    As of this date, Defendant is investigating the forgery claim.

### Bernardino Sedano

99.    On or about October 11, 2007, a sales agent for Defendant came to the home of Bernardino Sedano in Chicago, Illinois.

100.    Mr. Sedano speaks Spanish and does not understand or speak English very well.

101.    The Defendant's sales agent spoke to Mr. Sedano in Spanish and told him that

Defendant's product would save him money.

102.    Mr. Sedano was not told that there would be a termination fee for early termination.

103.    The contract that Mr. Sedano signed was written in English.

104.    Mr. Sedano explained to the sales agent that he did not understand English and the agent told him it was fine and just to sign the contract.

105.    Mr. Sedano signed a contract for five years at a price of $1.14 per therm.

106.    In October 2007, when Mr. Sedano signed up for Defendant's service, Peoples charged its customers $0.68 per therm.

107.    Since October 2007, Peoples charged its customers the following prices: in November 2007, $0.78 per therm; in December 2007, $0.78 per therm; and in January 2008, $0.74 per therm.

108.    Mr. Sedano filed a complaint with the Attorney General's Office.

109.    Mr. Sedano requested that his contract with Defendant be cancelled and the termination fee be waived.

110.    As of this date, the complaint is still being mediated with Defendant.

## APPLICABLE STATUTES

111.    Section 2 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (2004), provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice

12

described in section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

## STATUTORY REMEDIES

112.    Section 7 of the Consumer Fraud and Deceptive Business Practices Act, 815

ILCS 505/7, provides:

Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice.  The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction, revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act.  In the event the court finds the method, act or practice to have been entered into with intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation...

In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation....

13

## VIOLATIONS OF THE CONSUMER FRAUD ACT

113.   The Defendant, by the conduct set forth herein, has engaged in a course of trade or commerce which constitutes unfair and/or deceptive acts and practices declared unlawful under section 2 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, by:

    a.   Representing to consumers expressly or by implication that by signing up for natural gas through Defendant's program they would save money, when in fact Defendant cannot substantiate that claims and most consumers to date have not saved money;

    b.   Representing to consumers expressly or by implication that the price of natural gas in the market would continue to increase, when in fact no such guaranteed prediction of the natural gas market is possible;

    c.   Representing to consumers expressly that the price of gas would "go through the roof" thereby implying that locking in a rate would save consumers money, when in fact no such guaranteed increase in gas prices can be predicted;

    d.   Representing to consumers expressly or by implication that signing up for an alternative natural gas supplier is required in Illinois, when in fact consumers do not have to select an alternative natural gas supplier;

    e.   Representing to consumers expressly or by implication that consumers' gas bills on the budget billing plan would stay the same from month to month, when in fact reassessments every four months change the amount

significantly;

f.    Representing to consumers expressly or by implication that consumers can terminate the contract at anytime without a penalty when in fact there is a substantial penalty;

g.    Failing, during door-to-door solicitation, to orally disclose that the per therm price offered by Defendant is higher than the prices offered by both Peoples and Nicor, based on historical data;

h.    Failing, in some cases, to obtain valid signatures on contracts prior to enrolling consumers in Defendant's program; and

i.    Failing, after a contract for services is signed, to allow customers to cancel within the statutory three business days by redirecting calls and leaving calls on hold for lengthy periods of time.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, prays for the following relief:

A.    Finding that the Defendant has violated section 2 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1; including, but not limited to, the unlawful acts and practices alleged herein;

B.    Temporarily, preliminarily and permanently enjoining the Defendant from engaging in the deceptive practices alleged herein;

C.    Declaring that all contracts entered into between the Defendant and Illinois consumers by the use of methods and practices declared unlawful are rescinded and requiring

that full restitution be made to said consumers;

      D.      Assessing a civil penalty in the amount of Fifty Thousand Dollars ($50,000) per

violation of the Act found by the Court to have been committed by the Defendant with the intent

to defraud.  If the Court finds that the Defendant has engaged in methods, acts, or practices

declared unlawful by the Act, without the intent to defraud, then assessing a statutory civil

penalty of Fifty Thousand Dollars ($50,000), all as provided in section 7 of the Consumer Fraud

and Deceptive Business Practices Act, 815 ILCS 505/7;

      E.      Assessing an additional civil penalty in the amount of Ten Thousand Dollars

($10,000) per violation of the Consumer Fraud and Deceptive Business Practices Act found by

the Court to have been committed by the Defendant against a person 65 years of age and older as

provided in section 7(c) of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/7(c);

      F.      Requiring the Defendant to pay all costs for the prosecution and investigation of

this action, as provided in section 10 of the Consumer Fraud and Deceptive Business Practices

Act, 815 ILCS 505/10;

      G.      Providing such other and further equitable relief as justice and equity may require.

PEOPLE OF THE STATE OF ILLINOIS
BY LISA MADIGAN
Attorney General of Illinois

BY: _____
JAMES KOLE
Chief, Consumer Fraud Bureau

BY: _____
CHRISTINE NIELSEN
Assistant Attorney General

16

Atty No. 99000

LISA MADIGAN
Attorney General of Illinois

JAMES KOLE
Chief, Consumer Fraud Bureau

CHRISTINE NIELSEN
Assistant Attorney General
Consumer Fraud Bureau
100 West Randolph Street, 12th Floor
Chicago, Illinois  60601
312.814.6796

17

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on May 2, 2008, he electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing all counsel of record in this case including the following.

| Plaintiff's Counsel | |
|---|---|
| Arthur S. Gold, Esq.<br>GOLD & COULSON<br>11 S. LaSalle St., Suite 2402<br>Chicago, Illinois 60603<br>Fax 312.372.0778<br>asg@gcjustice.com | |

/s/ Kevin J. Clancy