IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAMELA TILLMAN, )
)
      **Plaintiff,** ) No. 08 C 1641
)
v. ) Judge Manning
)
INDIANA ENERGY SAVINGS CORP., ) Magistrate Judge Cole
d/b/a U.S. ENERGY SAVINGS CORP., )
      **Defendant.** )

## MEMORANDUM OPINION AND ORDER

Pamela Tillman seeks the names and contact information of every one of the defendant's Indiana customers, which presumably numbers in the thousands. Her claim is that one of the defendant's sales representatives made oral misrepresentations to her in order to entice her into switching to the defendant for her natural gas supplier. The deal was a fixed-rate program that, ostensibly, was designed to keep costs stable for a number of years, depending on the contract length; a kind of hedge against potential future increases. As the defendants put it, the customer may or may not see cheaper rates than its previous supplier. But the plaintiff says she was *guaranteed* cheaper rates, and was thereby enticed into signing up. She thinks that this was some sort of company-wide scam, cutting a swath through the Indiana market. She hopes to certify a class of those customers who were victimized in the way she claims she was. Presently, she has no proof. The defendant's position seems to be that this lone sales representative who spoke to Ms. Tillman was, even assuming Ms. Tillman's story to be true, a "rogue," and that her alleged misdeeds were isolated and not part of some company-wide deception.

In addition to allegedly being guaranteed savings (*Second Amended Complaint*, ¶ 5), Ms. Tillman complains that she was misled as to the length of the contract. She claims she was told it was just two years, not the five years it turned out to be. (*Second Amended Complaint*, ¶ 8). Discovery thus far has produced a transcript of a phone call among Ms. Tillman, the sales representative, and the defendant's office, in order to confirm the terms of the agreement before Ms. Tillman signed up. Early on in the brief conversation, the representative at the office clearly told Ms. Tillman that the agreement would "secure [her] natural gas rate at $1.14 per therm" and that "while the agreement does not promise savings, it does offer peace of mind, stability, and protection against potential future price increases." (*Defendant's Response to Plaintiff's Second Motion to Compel*, Ex. A). Ms. Tillman was specifically asked to confirm that this was what she wanted, and she did. (*Id.*).

As for the length of the contract term, it is clearly set out in the contract Ms. Tillman signed. The agreement, a little over five pages and set out in normal-sized type, states that the "initial period of the Agreement is 4 years or 5 years (If no period is selected, the initial period is deemed to be five years . . . .)." (Parenthesis in original). This statement appears no fewer than three times on three different pages, one time being at the top of the page Ms. Tillman signed. In other words, half of the pages in the contract state the term will be four or five years. There is no mention anywhere of a two-year term. (*Second Amended Complaint*, Ex. A, at 2, 3, 5).

She also alleged that she was not told that if she cancelled the contract, she would have to pay a sizeable termination fee. (*Second Amended Complaint*, ¶ 8). The second-to-last page of the contract sets out the cost of termination. It informs the customer that if they terminate the agreement, the defendants will charge them "10 cents per therm for the remaining years, or part thereof, of the

2

Term or anticipated Term (if the Term has not commenced) times the Customer's annual gas usage in therms." (*Second Amended Complaint*, Ex. A, at 5). Thus, the cost of cancellation would clearly be "sizeable" – the customer would be on the hook for all the gas they would have used. Once the Ms. Tillman signed up, the contract gave her fifteen calendar days to cancel the transaction without penalty. (*Second Amended Complaint*, Ex. A, at 5).

With all this set out in the contract she signed, Ms. Tillman faces an uphill battle. *See Reger Development, LLC v. National City Bank*, 592 F.3d 759, 766-67 (7th Cir. 2010)("A 'party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed this contract.'"); *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003)("A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it."); *Dugan v. R.J. Corman R. Co.*, 344 F.3d 662, 667 (7th Cir. 2003)(there is no "I didn't read it" defense); *Novitsky v. American Consulting Engineers, L.L.C.*, 196 F.3d 699, 702 (7th Cir. 1999)("People are free to sign legal documents without reading them, but the documents are binding whether read or not."); *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1207 (7th Cir. 1998)(if a party has an opportunity to read a contract, and could have discovered the alleged fraud by doing so, they cannot later complain about being bound to the contract's terms). *See also IFC Credit Corp. v. United Business & Indus. Federal Credit Union*, 512 F.3d 989 (7th Cir. 2008); *Chicago Pacific Corp. v. Canada Life Assurance Co.*, 850 F.2d 334 (7th Cir.1988); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925 (N.D.Ill. 2008)(collecting cases).

Thus far in discovery, Ms. Tillman has been given the names of the other 408 customers with whom her sales representative also spoke. Then, with the permission of the court, she sent each a

3

questionnaire, asking what they had been told in the sales pitch. Only 24 – less than 6% – responded. Perhaps the rest were not dissatisfied. *Cf. Silver v. New York Central RR*, 105 N.E.2d 923 (Mass. 1952)(absence of complaints of cold admissible). But "inferences from silence are perilous." Posner, Cardozo: A Study In Reputation, 37 (1990); *Coleman v. Interco, Inc. Division Plans*, 933 F.2d 550, 552 (7th Cir. 1991)(same); *United States v. Hale*, 422 U.S. 171, 176 (1975)(silence generally is so ambiguous that it is of little probative force, inviting the jury to speculate as to its meaning); Falknor, *Silence as Hearsay*, 89 Univ. of Pa.L.Rev. 192 (1940).

Only five people said they didn't even realize they had enrolled as customers in defendant's fixed-rate program. But that does not prove the point sought to be made. One third said they did not recall being told the fixed rate was lower than the rate they were paying. Half did not remember the sales representative telling them she was from the defendant. Half recalled that they were told the contract length would be four or five years. Half said they were told there was a charge to cancel the contract. (*Defendant's Response to Plaintiff's Second Motion to Compel*, at 3-4).

Since on the question you ask depends the answer you get, *Bay Ridge Operation Co. v. Aaron*, 334 U.S. 446, 484 (1948)(Frankfurter, J., dissenting), it is worth noting how the questions were phrased. For example, Ms. Tillman has previously argued that all 24 respondents said they were told the fixed rate plan "*would* save them money." (*Plaintiff's Motion to Compel*, at 2). Not so. The question was whether the respondent was "told that the Fixed Price Program *could* save [them] money?" (*Plaintiff's Motion to Compel*, Ex. A(emphasis supplied)). Of course it *could* save them money, depending on whether the fixed cost per therm from defendants happened to be below the fluctuating regulated rate charged by the respondent's previous provider. It *could* cost more

money as well. Ms. Tillman alleges she was told it *would* save her money. There is a significant difference between "could" and "would."

Obviously, even among the lone sales representative's contacts, there was not much evidence of facts – alleged misrepresentations – common to a class. That is not surprising when a putative class action is founded on oral misrepresentations. *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 677 (7th Cir. 2001); *Frahm v. Equitable Life Assur. Soc. of U.S.*, 137 F.3d 955, 957 (7th Cir. 1998); *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957-58 (7th Cir. 1989); *In re Bally Manufacturing Securities Corp. Litigation*, 141 F.R.D. 262, 267-68 (N.D.Ill. 1992); *Washington Nat. Ins. v. Jefferies & Co.*, 1990 WL 251916, *3 (N.D.Ill. 1990). Nonetheless, Ms. Tillman sought contact information regarding *all* of defendant's Indiana customers. She said the responses had corroborated her complaint, so broad discovery was warranted. As already noted, the responses had done nothing of the sort, and the motion was denied, but without prejudice. And, now Ms. Tillman has returned, asking again for the names and contact information of all defendants' Indiana customers. This time, she does so because she says she must counter the defendant's argument that the lone sales representative was acting on her own and in no way reflected company policy.

Nothing that has happened in the interim has mended any of the flaws in Ms. Tillman's own claims. That raises serious doubt as to whether she is an adequate representative for the putative class. *Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999). And if the 24 of the 408 who responded to the questionnaire had similar conversations with defendant's office – informing them that savings weren't guaranteed – and could have learned similar information from the contracts they signed as Ms. Tillman could have, then no one would have much of a claim. *Id.* (". . . if the class representative's claim is both weak *and* typical – if the case as a whole is as weak

5

as the representative's individual claim – then the case should be dismissed, with or without class certification."). But the apparent weaknesses of Ms. Tillman's case do not doom this as a class action, *Robinson*, 167 F.3d at 1157, and class certification is a matter for another day.

More important for the current dispute is the fact that, despite her assertion that the responses to the questionnaires corroborate her allegations, the responses do not corroborate her central allegation, that she was guaranteed savings. Moreover, even the tiny percentage of respondents demonstrated that representations – or their recollection of them – varied among the putative class members. Simply put, the results of that exercise do not merit discovery of the defendant's entire Indiana customer list and contact information. That roster would number in the thousands and the effect that Ms. Tillman's contact of defendants' customers might have on defendant's business is a legitimate concern. *Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748, 759 (7th Cir. 2000). The Supreme Court has noted "the 'heightened susceptibilities of nonparty class members to solicitation amounting to barratry as well as the increased opportunities of the parties or counsel to "drum up" participation in the proceeding.'" *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 n.12 (1981). There is a real danger that, with a weak claim, Ms. Tillman would simply be fishing around for someone – anyone – with some semblance of complaint about the defendants.

"Class actions serve an important function . . . [but] [t]hey present . . . opportunities for abuse as well as problems for courts and counsel in the management of cases." *Gulf Oil Co.*, 452 U.S. at 99-100. As a result, the "court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Id.* at 100. Similarly, the Supreme Court has cautioned more generally that the requirement of Rule 26(b)(1) that the material sought in discovery be "relevant" should be firmly applied, and the district

6

courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense.... Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process." *Herbert v. Lando*, 441 U.S. 153, 177 (1979). Failure to exercise that control results in enormous costs to the litigants and to the due administration of justice. *Cf. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); Frank Easterbrook, *Discovery as Abuse*, 69 B.U.L.Rev. 635 (1989).

The court's discretion is not unlimited, however, and plaintiffs have a right to communicate with members of the putative class. *Id.* at 100-01; *Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748, 759 (7th Cir. 2000). As such, any limitation on discovery should be carefully drawn, weighing the need for limitation against the potential interference with the rights of the parties. *Id.* at 101-02; *Chartwell*, 204 F.3d at 759. The calculus in this case must include the less-than-helpful results of the first round of questionnaires. The sales representative involved with those respondents was supposedly the basis for Ms. Tillman's class action in the first place. Yet there was inconsistency even among the smaller segment of her customers. Nonetheless, there is the factor of the defendant's stance that the lone sales representative who spoke with Ms. Tillman was a "rogue," acting on her own and departing from whatever script or business practices the defendant had. Ms. Tillman ought to have some opportunity to see what experiences customers had with other sales representatives. But given the results of her first try, and the apparent weakness of her case, the scope of her requested discovery is overly broad.

The defendant shall randomly select ten of its sales representatives and provide their names and number of contacts to Ms. Tillman. Ms. Tillman will then select three from that list. The

defendant will then provide the names and necessary contact information of those representatives' contacts to Ms. Tillman, as was done before with the lone sale representative. Ms. Tillman can then submit to the court for approval questionnaires to that limited universe of defendant's customers. As before, the parties shall work cooperatively to arrive at agreement on the questions to be asked. The questions, however, must be revised and edited to better reflect Ms. Tillman's allegations about her experiences than in the first go-round.

Obviously, there is no value to asking whether someone was told they *could* save money with the fixed rate program. A positive answer to that question would be irrelevant. Moreover, the respondents ought to be asked if the sales representatives' visits were accompanied by calls to the defendant's office, as happened in Ms. Tillman's case, where they were told that savings were not guaranteed. And, they ought to be asked if they had the opportunity to read the written agreement (assuming their program contracts were the same or similar in significant aspects as Ms. Tillman's). Both these things tend to undermine Ms. Tillman's cause of action; they would have a similar effect on any customer's cause of action.

## CONCLUSION

The plaintiff's second motion to compel [#69] is GRANTED in part and DENIED in part. The case is set for status on May 28, 2010, at 8:30 a.m. to discuss the content of the questions. Under no circumstances may the plaintiff or her counsel have any contact with any of the defendant's customers without leave of court.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 4/27/10